RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 04a0366p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

RICHARD ELLIS, Executor of the Estate of Vernon Ellis,
RICHARD ELLIS, THOMAS ELLIS, and LAVERNE
BRASHEAR,

        *Plaintiffs-Appellants
(02-6421)/
Cross-Appellees*,

    *v.*

GALLATIN STEEL COMPANY (02-6429) and HARSCO
CORPORATION (02-6422/6478),

        *Defendants-Appellees/
Cross-Appellants.*

Nos. 02-6421/6422/6429/6478

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
Nos. 99-00242; 00-00263—William O. Bertelsman, District Judge.

Argued: June 16, 2004

Decided and Filed: October 26, 2004

Before: SILER, DAUGHTREY, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jeffery M. Sanders, Ft. Thomas, Kentucky, for Appellants. John C. Bender, GREENEBAUM, DOLL & McDONALD, Lexington, Kentucky, John B. Nalbandian, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Jeffery M. Sanders, Ft. Thomas, Kentucky, James M. Hecker, TRIAL LAWYERS FOR PUBLIC JUSTICE, Washington, D.C., Jonathan A. Conte, Cincinnati, Ohio, for Appellants. John C. Bender, David A. Owen, GREENEBAUM, DOLL & McDONALD, Lexington, Kentucky, John B. Nalbandian, Thomas T. Terp, Sr., TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellees.

1

_____

## OPINION

_____

SUTTON, Circuit Judge.  Gallatin Steel Company manufactures steel and Harsco Corporation processes slag (a steel byproduct) on adjacent pieces of property in rural Kentucky.  In addition to steel and slag, both operations produce a considerable amount of dust, what has come to be known in the regulatory world as "fugitive dust," a phrase that loses its redundancy when applied to dust particles that migrate from one piece of property to another.  Unhappily for the Ellis family and for Laverne Brashear, the dust particles from these manufacturing operations migrated to the Ellis family farm and to Brashear's residence, both of which neighbor the Gallatin and Harsco operations.

The itinerant dust prompted several private and governmental lawsuits.  The Ellises and  Brashear sued the two companies under four legal theories, among others: (1) The companies violated Kentucky's fugitive-dust emission rule, which constitutes a violation of the Clear Air Act; (2) the companies failed to obtain a state "prevention of significant deterioration" (PSD) permit as a precondition to construction of a "major emitting facility," which also constitutes a violation of the Clean Air Act; (3) the companies were jointly and severally liable for response costs incurred by the Ellises under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA); and (4) the companies violated Kentucky nuisance law.

The Environmental Protection Agency of the United States (EPA) also sued the companies under the Clean Air Act and eventually entered into consent decrees with Gallatin and Harsco.  The decrees required Gallatin and Harsco to implement compliance measures and to pay civil penalties.  Concluding that the decrees barred the private plaintiffs' fugitive-dust claims that pre-dated the entry of the decree, the district court dismissed all of these claims.  Concluding that the consent decrees and state administrative proceedings precluded the PSD claims and that the CERCLA claim was meritless, the district court dismissed these claims as well.  As to the private plaintiffs' fugitive-dust claims that post-dated the consent decree, the district court awarded injunctive relief (based on the Clean Air Act and state-law nuisance) and compensatory and punitive damages totaling $848,280 (based on state-law nuisance).  We affirm all of these rulings with one exception: the district court's award of injunctive relief under the Clean Air Act.  As to that claim, the private plaintiffs have not shown that they were entitled to injunctive relief and have not shown that they complied with the notice requirements of the Clean Air Act.  That one ruling, accordingly, must be reversed.

## I.

**Factual Background.**  Vernon Ellis lives on a 168-acre farm in Gallatin County, Kentucky.  His sons, Richard and Thomas, also live on the farm in separate residences along with each of their spouses and children.  Laverne Brashear lives across the road (U.S. Highway 42) from them on a half-acre plot of land.

In April 1995, Gallatin Steel Company and Harsco Corporation began operating a steel manufacturing facility and a slag processing plant, respectively, in an industrially zoned area located a quarter-mile down U.S. 42 to the west of the Ellises and Brashear.  Gallatin and Harsco are separate legal entities.

That same month, the Ellises began to notice an unfamiliar dust on the farm, which they attributed to Gallatin's and Harsco's operations.  With the arrival of the dust, the Ellises say, they have experienced more respiratory problems, headaches, itchy throats and infections than they had in the past.  To try to mitigate these medical problems, Richard and Thomas Ellis kept their children indoors, they discarded their above-ground swimming pools and they stopped hunting on their land.

In 1997, Richard and Thomas began documenting the dust problems by (among other things) taking photos of the dust crossing Gallatin's and Harsco's property lines. All told, they spent over 8,000 hours monitoring the steel manufacturing and slag processing operations. In addition to the visible dust, the Ellises noticed that explosions occur at the Harsco slag plant, "throwing heavy chunks of slag out like a volcano and shaking the ground like an earthquake." D. Ct. Op. at 7 (Oct. 8, 2002). These explosions regularly vibrate plaintiffs' houses, knock objects over and on one occasion broke Brashear's water pipes.

**Procedural History**. The fugitive dust and slag explosions prompted seven different proceedings. The Ellises filed two citizen lawsuits against Gallatin and Harsco under federal environmental protection laws (and later amended their complaint to include state-law nuisance claims). Brashear filed a similar citizen suit against Harsco (and also later amended her complaint to include state-law nuisance claims). The United States filed two enforcement actions against the corporations. And Gallatin and Harsco filed various permit applications that resulted in state administrative proceedings to determine whether they had the proper permits for their operations. The proceedings arise in the following statutory and regulatory context.

The federal Clean Air Act is a model of cooperative federalism. It requires each State to establish a state implementation plan (SIP) to limit emissions in accordance with national ambient air quality standards set by the federal EPA. 42 U.S.C. §§ 7409(b)(1), 7410(a)(1). In compliance with this requirement, Kentucky's SIP prohibits "the discharge of visible fugitive dust emissions beyond the lot line of the property on which the emissions originate." 401 Ky. Admin. Regs. 63:010, § 3(2). Other Kentucky laws implement the Clean Air Act by prohibiting the construction of a major emitting facility in designated "attainment areas" (regions, such as Gallatin County, that meet national air quality standards) without first obtaining a PSD permit. 401 Ky. Admin. Regs. 51:017, § 8. The Kentucky Division of Air Quality manages the PSD program and grants the requisite permits. The federal EPA and state agencies may enforce these regulatory requirements on their own initiative or at the suggestion of private citizens. *See* 42 U.S.C. § 7413(a) (federal EPA enforcement authority); 401 Ky. Admin. Regs. 63:010 & 51:017 (state regulations); 42 U.S.C. § 7604 (citizen suit provisions); *see also Her Majesty the Queen v. City of Detroit*, 874 F.2d 332, 335 (6th Cir. 1989) (EPA-approved state implementation plans are enforceable in federal court).

To supplement these enforcement provisions, the Clean Air Act allows citizens to file actions to enforce its provisions when two requirements have been met. First, citizens cannot commence their own suits unless they have given 60-days' notice to the Administrator of the EPA, to the State, and to the alleged violator. 42 U.S.C. § 7604(b)(1)(A). Second, citizens cannot commence independent suits if the EPA or the State has already commenced an enforcement action and is diligently prosecuting the violation, though they may intervene in these actions. 42 U.S.C. § 7604(b)(1)(B).

On April 28, 1995, the Kentucky Division of Air Quality issued a (non-PSD) air emission permit to Harsco for its slag operation. In 1997, the same Kentucky agency determined that Gallatin and Harsco were not a single emitting source and issued Gallatin a PSD permit. The resulting permit covered Gallatin's steel operations only and did not include Harsco's slag processing plant.

In anticipation of filing a citizen suit under the Clean Air Act, the Ellises sent a notification letter, dated December 29, 1998, to the EPA, the U.S. Attorney General and the Kentucky Natural Resources and Environmental Protection Cabinet. Less than 60 days later, on February 25, 1999, the United States filed its first enforcement action, civil action 99-030, in the district court for the Eastern District of Kentucky. The enforcement action charged Gallatin with violations of the Clean Air Act and several air-quality regulations.

On July 30, 1999, the Ellises filed their first citizen suit, civil action 99-152, against Gallatin and Harsco alleging numerous violations of the Clean Air Act, the Clean Water Act, CERCLA, and the Resource Conservation and Recovery Act. Four months later, on December 1, 1999, the Ellises filed a

second citizen suit, civil action 99-242, against Gallatin and Harsco alleging numerous violations of the same four federal statutes.

On January 19, 2000, the district court granted summary judgment against the Ellises on all but three of the claims in their first citizen suit because they had failed to give proper notice of the claims. *See* D. Ct. Op. at 1 (Jan. 19, 2000). The district court consolidated the three surviving counts (two CERCLA claims and a Clean Air Act claim) into the Ellises' second citizen suit.

On June 22, 2000, the Kentucky Division of Air Quality reversed its earlier determination that Gallatin and Harsco were not a single source. As a result, the agency issued a revised PSD permit to Gallatin. And because Harsco did not have a PSD permit (it had a non-PSD air emission permit), the agency sent Harsco a letter on July 5, 2000, asking the company to submit a PSD permit application for its slag processing plant. In August 2000, Gallatin and Harsco filed administrative appeals to the agency's determination that their facilities composed a single source.

On October 4, 2000, the United States amended its complaint and proposed a consent decree to resolve the federal claims. As the Ellises concede, the United States added claims that "overlapped with the Ellises' existing claims in their second complaint." Ellis Br. at 19.

At this point, Brashear entered the picture. On December 27, 2000, she filed a complaint against Harsco alleging four violations of the Clean Air Act.

The district court granted the Ellises' and Brashear's motion to intervene in the United States' enforcement suit. On July 20, 2002, the district court granted the United States' motion to enter the Gallatin and Harsco consent decrees. The Gallatin consent decree included various compliance measures, such as the use of a vacuum truck and the installation of a dust suppression system, designed to reduce fugitive dust emissions; Gallatin also agreed to pay a civil penalty of $925,000. Harsco's consent decree also included compliance measures, as the company agreed to relocate its slag dumping, to install a containment facility around its slag operations and to install a water-spray system. Harsco agreed to pay a civil penalty of $175,000.

The next major development came in September 2002, when the district court ruled on opposing summary-judgment motions in the remaining citizen suits. The court concluded that the Harsco consent decree operated as a res judicata bar to the private fugitive-dust claims predating its entry, which is to say the consent decree barred citizen claims regarding all past violations and all continuing violations up to the date the court entered the decree. It also concluded that the Gallatin consent decree operated as a res judicata bar to the citizens' PSD permit claims.

Three months after the entry of the consent decrees, the court held a bench trial concerning the second citizen suit. After the trial, the court held that the plaintiffs had no right to enforce the consent decree against Harsco. But since the plaintiffs showed that fugitive dust had crossed the Ellises' property lines after the entry of the consent decrees on June 20, 2002, the court held that those fugitive-dust violations constituted a common-law nuisance under state law. To remedy the nuisance, the court awarded each plaintiff $24,570 in compensatory damages (for the reduction in the rental value of their property) and a lump sum of $750,000 in punitive damages to the plaintiffs collectively. The court apportioned liability for the compensatory and punitive damages, finding Harsco 80% liable and Gallatin 20% liable. To prevent future violations of the Clean Air Act and future state-law nuisance violations, the court granted the plaintiffs a permanent injunction against Harsco and Gallatin and assigned a court-appointed expert to monitor Harsco's and Gallatin's compliance with the injunction.

## II.

We initially consider Gallatin's and Harsco's challenges to the compensatory and punitive damage awards under state nuisance law. The companies raise three challenges: Gallatin claims that the evidence

does not support the compensatory damage award in favor of Brashear; Harsco challenges the admission of expert testimony on the appropriate amount of compensatory damages; and both companies challenge the award of punitive damages.

### A. Compensatory Damages to Brashear

Gallatin first argues that the evidence does not support the district court's award of post-consent-decree nuisance damages to Brashear. Even if the evidence tends to show that dust from Harsco's slag processing and dumping operations created a nuisance on her property, Gallatin argues that the evidence does not tie its steel-processing operation to this problem.

The district court, however, found that "[d]ust from *Gallatin and* Harsco . . . [has] interfered with Ms. Brashear's use and enjoyment of her property," D. Ct. Op. at 10 (Oct. 8, 2002) (emphasis added)—a finding that the evidence supports and that thus is not clearly erroneous. *See EEOC v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 833 (6th Cir. 1997). Contrary to Gallatin's suggestion, it is not true that Brashear's testimony and evidence "lacked any reference to emissions or activities at Gallatin Steel and instead focused solely on Harsco's slag processing operations." Gallatin Br. at 40. At trial, Brashear said the following:

Q. Mrs. Brashear, are you getting dust on your property from the Harsco *and Gallatin Steel* Companies.

A. Yes, I am.

Q. Can you tell us about that?

THE COURT: As of now, you mean?

Q. Mrs. Brashear, as of today, are you getting dust on your property *from these two companies*?

A. I most certainly am.

Q. Can you tell us about that?

A. Last night, I went out and I cleaned my patio furniture, and I have the cloth that I cleaned it off with. I had metallic dust on it. I had the gray dust, and it was all on there last night when I cleaned.

JA 513 (emphasis added).

In the course of these questions and answers, Brashear asserts not once, but twice, that dust from Gallatin landed on her property. That she could identify Gallatin and Harsco as sources of the dust should not be cause for surprise in view of the difference in color between the companies' emissions (red and gray). Bolstering Brashear's testimony, an expert testified that particulates found on Brashear's property came from Gallatin's operations.

Also unconvincing is Gallatin's contention that Brashear failed to show that Gallatin's dust—not just Harsco's dust—interfered with her use and enjoyment of the property. The company offers no explanation, to say nothing of providing any evidence, as to why Harsco's gray dust would interfere with Brashear's use and enjoyment of her property but Gallatin's red dust would not. The district court, moreover, fully accounted for any proportional difference in the degree of interference caused by Gallatin's and Harsco's dust through its allocation of nuisance damages (80% for Harsco and 20% for Gallatin).

## B. Expert Testimony

Harsco challenges the award of compensatory damages on a different ground, arguing that the district court should have excluded the testimony of the plaintiffs' expert, Roger Meade, on the appropriate amount of damages. We review the district court's admission of expert testimony for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Harsco first argues that the district court failed to apply any of the *Daubert* factors for evaluating expert testimony. Contrary to Harsco's argument, though, *"Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'" *Id.* at 150 (emphasis in original). A district court does not err in failing to mention the *Daubert* factors when they are not pertinent to assessing the reliability of a particular expert. *Id.* Here, for example, an accurate assessment of a local real-estate market does not require peer review or extensive scholarly writing.

Second, Harsco argues that Meade initially applied the wrong legal standard (diminution in market value) in his calculations before he later applied the correct legal standard (diminution in the value of use of the property). *See* Ky. Rev. Stat. Ann. § 411.560(1)(b)(1) (setting out damages measurements). But the record shows that Meade considered the correct standard for damages at trial, and, more importantly, that the district court awarded damages based on the value of use of the property, D. Ct. Op. at 16 (Oct. 8, 2002). As the district court's use of the correct standard when actually awarding damages demonstrates, any flaw in Meade's initial testimony was corrected by the weight given that testimony in the bench trial.

Third, Harsco claims that Meade's failure to consider alternative sources that might have caused the dust renders his testimony unreliable. Not true. "In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Jahn v. Equine Service, PSC*, 233 F.3d 382, 390 (6th Cir. 2000).

## C. Punitive Damages

Gallatin and Harsco next challenge the punitive-damages award, taking the district court to task for applying the wrong legal standard, for making its determination without sufficient factual support and for awarding the wrong amount. We disagree.

Under Kentucky law, punitive damages may be awarded for gross negligence when there has been a "failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by 'wanton or reckless disregard for the lives, safety or property of others.'" *See Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 52 (Ky. 2003). Applying this test, the district court found that, "[b]ased upon the entire record, . . . Harsco's conduct is [in] 'wanton or reckless disregard for the lives, safety or property of others.'" D. Ct. Op. at 17 (Oct. 8, 2002). The court's finding that Gallatin's conduct warranted punitive damages immediately follows the court's statement of this standard.

In arguing that the district court applied the wrong legal standard, Gallatin and Harsco point to the standard set forth in Ky. Rev. Stat. Ann. § 411.184(2). The Kentucky Supreme Court, however, invalidated § 411.184 six years ago, *see Williams v. Wilson*, 972 S.W.2d 260 (Ky. 1998), and, contrary to the companies' suggestion, *Bowling Green Municipal Utilities v. Atmos Energy Corp.*, 989 S.W.2d 577 (Ky. 1999), does not resurrect the statute. In *Bowling Green*, the Kentucky Supreme Court applied the statute to avoid retroactive application of a new court decision because § 411.184 had been in effect at the time of trial. *See id.* at 580; *see also Burns v. Level*, 957 S.W.2d 218, 222 (Ky. 1998). No such retroactivity problem exists here. Neither is Gallatin correct in arguing that Kentucky statutes declared unconstitutional somehow remain in effect, as opposed perhaps to remaining as artifacts on the books, until repealed by the legislature. Gallatin Br. at 42 n.11. *See Spanish Cove Sanitation, Inc. v. Louisville-Jefferson County Metro. Sewer Dist.*, 72 S.W.3d 918, 921 (Ky. 2002) (explaining that "any statute passed in contravention of the [Kentucky] Constitution is void *ab initio*").

Satisfied that the district court identified the correct legal standard for punitive damages, we review its application of the standard for clear error. *Sterling v. Velsicol Chem.*, 855 F.2d 1188, 1198 (6th Cir. 1988). The district court found that Harsco and Gallatin acted with "wanton or reckless disregard for the lives, safety or property" of the Ellises and Brashear. As to Harsco, the district court found that it operated its slag processing facility for seven years without air pollution controls sufficient to stop its air pollution, all the time knowing that its dust created a nuisance but refusing to take action until the district court ordered it. The court also found that Harsco built its slag pit in the open even though it knew explosions would result from rain hitting the molten slag and that the company neglected to cover the pit to stop the explosions until the court ordered the construction of a containment building. As to Gallatin, the district court found that it knew dust from its operations drifted onto plaintiffs' land but did not abate the nuisance. The record contains sufficient evidence to support these findings. In arguing that they took steps to ameliorate the nuisance, Harsco and Gallatin merely offer an explanation why a district court might not reach the conclusion it did, not an explanation why this district court's conclusions rose to clear error. *See Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985); *see Franklin v. Aycock*, 795 F.2d 1253, 1257–58 (6th Cir. 1986) (appellant's burden to meet the clearly erroneous standard is not met by showing a conflict in testimony).

Harsco and Gallatin also challenge the district court's calculation of the amount awarded as punitive damages, which we review for "an abuse of discretion." *Smoot v. United Transp. Union*, 246 F.3d 633, 647 (6th Cir. 2001). Harsco argues that the district court abused its discretion in making this calculation by failing to apply Ky. Rev. Stat. Ann. § 411.186, which sets out five factors "the trier of fact *should* consider." (Emphasis added.) While the district court did not cite § 411.186, it did explicitly consider two of the statutory factors when it discussed the duration of the misconduct and the defendants' "refusal to consistently take the steps to stop fugitive dust from crossing their property lines," D. Ct. Op. at 18 (Oct. 8, 2002). A district court need not prepare detailed findings on every possible issue; rather it simply needs to provide a justification upon which its final conclusion reasonably can be based. *Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414, 418 (6th Cir. 1992). These two references, taken in conjunction with the court's other references to the defendants' conduct and with the discretionary language of the statute (the trier "should" consider), satisfy us that the court did not fail to apply the correct legal standard. No abuse of discretion occurred.

Harsco, finally, argues that the district court impermissibly based the punitive-damages award on nuisance *and* the Clean Air Act. Because the Act does not authorize punitive damages, Harsco argues, an award based on this theory (even in part) must be reversed. But in making the award, the district judge independently relied on both theories, and no one argues that the theories applied to different events or violations. For these reasons, a decision invalidating the Clean Air Act theory for the punitive damages would leave untouched the nuisance theory, which is sufficient to establish that any error was harmless and thus to uphold the punitive-damages award. Fed. R. Civ. P. 61. All four of the cases cited by Harsco, in contrast, involve general jury verdicts, where the jury returned a damages award in response to multiple theories of liability without identifying the theory upon which they had relied. *See Virtual Maint., Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 667 (6th Cir. 1993); *Robertson Oil Co. v. Phillips Petroleum Co.*, 871 F.2d 1368, 1374–75 (8th Cir. 1989); *Asbill v. Housing Auth. of Choctaw Nation of Oklahoma*, 726 F.2d 1499, 1504 (10th Cir. 1984); *Square Liner 360, Inc. v. Chisum*, 691 F.2d 362, 376–77 (8th Cir. 1982). In that setting, unlike this one, reviewing courts cannot determine whether the damage award rests on all of the theories or just one, creating the possibility that the reversal of one theory would eliminate the sole theory upon which the jury rested its decision. No such problem exists here.

### D. Injunction

The companies also appear to challenge the entry of the injunction, arguing that the district court abused its discretion in granting prospective injunctive relief on the state-law nuisance claims. Ample evidence—including the threat of continuing violations by Gallatin and the existence of actual violations

by Harsco—establishes that the district court did not abuse its discretion in granting this injunction under state law.

### III.

#### A.  Claims between Consent Decree Filing and Entry

Turning to the federal law claims, the Ellises first challenge the district court's res judicata ruling regarding their fugitive-dust claims under the Clean Air Act.  While they concede that the Harsco consent decree barred many of their fugitive-dust claims, they argue that res judicata does not apply to those violations occurring between the date the parties filed the consent decree with the court (August 29, 2001) and the date the district court entered the decree (June 20, 2002).

The language of the consent decree, however, defeats this argument.  "In consideration of the payments . . . and the compliance measures [made] by Harsco," it says, "the United States covenants not to sue or bring any administrative action against Harsco . . . based on the claims in the Complaint *up through the date of entry* of this Consent Decree."  JA 1288 (emphasis added).  By its terms, in other words, the decree covers all claims "up through the date of entry" of the decree, language that picks up claims filed before the parties submitted the consent decree to the court *and* claims filed before the court entered the decree.

But even if there were ambiguity in this language (which there is not), the district court's interpretation of its own decree as applying to all claims filed before the entry of the decree, D. Ct. Op. at 18 (Sept. 12, 2002), would further undermine this argument.  A district court's interpretation of a consent decree that it has approved deserves "substantial deference."  *See Huguley v. Gen. Motors, Inc.*, 999 F.2d 142, 146 (6th Cir. 1993).  Because the Ellises had an "opportunity to fully litigate" the issues encompassed by the consent decree as intervenors in that law suit, D. Ct. Op. at 18 (Sept. 12, 2002), res judicata bars their subsequent claims, *Huguley*, 999 F.2d at 146.

The Ellises offer two responses, each unpersuasive.  They initially argue that the EPA and Harsco could not have "actually adjudicated" any claims for violations that occurred after the date they filed the consent decree with the court since the court entered the decree without any alterations and without any increase in the penalty imposed on Harsco.  The touchstone of res judicata effect, however, is the consent decree itself, which resolves all claims "through the date of entry" of the decree.  Nor do the cases cited by the Ellises alter this conclusion.  Those cases conclude only that the preclusive effect did not extend to claims that arose after the *entry* date of a consent decree.  *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955); *Citizens Legal Envtl. Action Network v. Premium Standard Farms*, No. 97-6073-CV-SJ-6, 2000 WL 220464, at *7 (W.D. Mo. Feb. 23, 2000) [hereinafter "*CLEAN*"]; *Old Timer, Inc. v. Blackhawk-Central City Sanitation Dist.*, 51 F. Supp. 2d 1109, 1117–18 (D. Colo. 1999); *Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 629 (D. Md. 1987).  In the end, the fact that the EPA did not increase the penalty in light of the violations that may have occurred between the time the consent decree was filed with the court and the time the court entered it no more shows that it did not "actually adjudicate" claims for these violations than it shows that the EPA believed the existing civil penalty was appropriate given the defendants' overall pattern of behavior.

The Ellises next contend that res judicata does not apply to this consent decree because the Government has not "diligently prosecuted" the Clean Air Act action.  The "diligent prosecution" requirement, however, represents a limitation on a citizen's ability to file suit, not a limitation on the effect of subsequent governmental action on a citizen's right to maintain the suit.  *See* 42 U.S.C. § 7604(b) ("No action *may be commenced* . . . (B) if the Administrator or State has commenced and is diligently prosecuting a civil action . . . to require compliance.") (emphasis added).  One court, it is true, has looked to "diligent prosecution" as a criterion for whether the Government and the citizens were in privity for res judicata purposes.  *See CLEAN*, 2000 WL 220464, at *11 ("[T]he citizens . . . are the same party as the State only

as to that which the state has diligently prosecuted."). But even if we were to apply that rule here, which we ultimately need not consider, the fact remains that the plaintiffs intervened in the suit between Harsco and the Government and had an unchallenged "opportunity to fully litigate the issues" in the earlier proceeding, D. Ct. Op. at 18 (Sept. 18, 2002), making privity irrelevant to the disposition of this particular argument.

### B. Post-Consent Decree Injunctive-Relief Claims

Harsco and Gallatin challenge the district court's decision to grant injunctive relief on the Ellises' Clean Air Act fugitive-dust claims three months after the court entered the consent decree. In support, they argue (1) that the Ellises did not satisfy the traditional standards for obtaining injunctive relief (particularly a showing of irreparable harm) because they never notified the EPA about the violations, never asked the agency to enforce the consent decree and did not give the remedial requirements of the consent decree sufficient time to work and (2) that these alleged post-consent-decree violations constitute "new" claims that must separately comply with the notice provisions of the Clean Air Act, 42 U.S.C. § 7604(b). We agree and therefore reverse this aspect of the injunction—at least to the extent it relies on federal rather than state law.

In entertaining these fugitive-dust claims, the district court did not dispute that they stemmed from the same types of migrating-dust allegations that led to the consent decrees. In its view, the consent decrees did not afford sufficient relief because the plaintiffs had "no rights to enforce the consent decrees" even though "they are the ones who daily live [with] the dust problems." D. Ct. Op. at 18 (Oct. 8, 2002). The EPA, which may enforce the decree, the district court added, "does not monitor" the situation on a regular basis. *Id.* Having chosen to entertain the Ellises' new fugitive dust claims, the court determined that Harsco had continued to send dust across its property line and that Harsco and Gallatin had failed to take adequate dust-abatement measures, even after the consent decrees were entered, in violation of the Clean Air Act. Due to the threatened "irreparable harm" caused by actual and threatened fugitive-dust violations, the court awarded injunctive relief under the Clean Air Act.

The injunction entered by the district court essentially mimicked the Harsco consent decree by requiring Harsco to continue using the "enclosed slag dumping containment structure" and water spray system to minimize dust emissions. JA 178-79, 1273–77. The court went beyond the consent decrees, however, in one respect. It appointed a "special master . . . to monitor the visible fugitive-dust situation at Harsco and Gallatin"—"whether visible fugitive-dust is crossing their property lines for violations of the Clean Air Act." JA 178–79. The consent decree between the EPA and Harsco, by contrast, required Harsco only to allow the EPA access to its facilities in order to "inspect[]" and "verify[] compliance" with the consent decree. JA 1276.

In advancing the essential goal of "protect[ing] and enhanc[ing] the quality of the Nation's air resources," 42 U.S.C. § 7401(b)(1), the Clean Air Act relies on three sources of enforcement authority. The Act entrusts the EPA with primary responsibility for promulgating national ambient air quality standards. 42 U.S.C. § 7409. It then requires the States to develop their own implementation plans to ensure that these standards are met and permits States to enforce these plans. *See id.* § 7410. If States fail to enforce their plans, the statute authorizes federal EPA action and private enforcement actions or "citizen suits." *See id.* §§ 7413(a) & 7604.

Under the citizen-suit provision, the key provision at issue in this dispute, individuals may sue for violations of an "emission standard or limitation" under a state implementation plan, such as Kentucky's mandate that "[n]o person shall cause or permit the discharge of visible fugitive dust beyond the lot line of the property on which the emissions originate," 401 Ky. Admin. Regs. 63:010. *See* 42 U.S.C. § 7604(a)(1) & (f). Before bringing such an action, however, private parties must notify the EPA, the State in which the alleged violation occurred and the alleged violator. *See id.* § 7604(b). The notice must describe the proscribed activity (including the dates and locations of specific incidents), and it must identify the person responsible for the violations and the applicable standard. *See* 40 C.F.R. § 54.3. "No action" under the

Clean Air Act's citizen-suit provisions, the statute mandates, "may be commenced" within 60 days of when the plaintiffs have satisfied these notice requirements, 42 U.S.C. § 7604(b)—a limitation that the courts may not excuse, *cf. Hallstrom v. Tillamook County*, 493 U.S. 20, 29–31 (1989) (construing similar notice provision in Resource Conservation and Recovery Act as mandatory); *Walls v. Waste Res. Corp.*, 761 F.2d 311, 316 (6th Cir. 1985) (same, Resource Conservation and Recovery Act and Clean Water Act).

Comparable notice provisions of the Resource Conservation and Recovery Act, the Supreme Court has said, serve two functions: to "allow[] Government agencies to take responsibility for enforcing environmental regulations" and to give the alleged violator "an opportunity to bring itself into complete compliance." *Hallstrom*, 493 U.S. at 28. The notice provisions demonstrate that Congress has authorized citizen suits only when environmental officials "*fail* to exercise their enforcement responsibility" and has provided an "interstitial" role for private parties in enforcing the statute. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60–61 (1987) (emphasis added); *see also Atlantic States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124, 127 (2d Cir. 1991) ("The purpose of the citizen suit is to stop violations of the Clean Water Act that are not challenged by appropriate state and federal authorities."). The statute, however, does not permit citizen suits to seek types of relief "that the [government] chose to forgo"; otherwise, administrative "discretion to enforce the [statute] in the public interest would be curtailed considerably" and the "nature of the citizens' role" would become "potentially intrusive." *Gwaltney*, 484 U.S. at 60–61.

In the face of these carefully reticulated enforcement requirements, the Ellises' injunctive-relief claims for post-consent-decree violations of the Clean Air Act suffer from at least two defects. First, the Ellises do not dispute that they were required to satisfy the traditional requirements for obtaining an injunction—namely, establishing a risk of "continuing irreparable injury if the court fails to issue the injunction." *United States v. Szoka*, 260 F.3d 516, 523 (6th Cir. 2001). Whether in the district court or in this Court, the Ellises have failed to explain why the June 20, 2002, consent decrees do not adequately deal with these claims. The parties agree that the decrees cover the same types of fugitive-dust claims covered by the injunction; that the decrees are forward looking and apply to "continuing" violations of the Clean Air Act, JA 1187, 1293–94; that the decrees "reserve all rights to deal with anything that happens in the future," JA 846; that the decrees impose monetary penalties of $1,000 to $5,000 per violation; that there is no evidence that the EPA failed to enforce the decrees; and that the EPA was not notified that additional violations had occurred. *See Harthman v. Witty*, 480 F.2d 337, 340 (3d Cir. 1973) (reversing grant of a second injunction as unnecessary because an injunction granted less than two months earlier already prohibited future pollution). On top of this, the decrees were just three months old when the district court entered its injunction, meaning that the remedial requirements imposed by the decrees either had just been completed or had not yet been completed at all. The decrees specifically contemplated some time for implementing their terms as they required the remedial changes to be put in place between 60 and 180 days. Under these circumstances, the district court committed reversible error in concluding that a risk of continuing irreparable harm had been shown. *See Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997) (requiring a showing of a "real or immediate" threat of recurrent violations of legal rights); *Ladd v. Thomas*, 14 F. Supp. 2d 222, 224 (D. Conn. 1998) (refusing to find an "immediate threat that the plaintiff will be wronged again" where the court had previously awarded declaratory relief against the defendant).

Second, the Ellises have not explained in their briefs and did not explain at oral argument why a consent decree dismissing the same types of claims that they had previously filed does not require them to satisfy the traditional requirements for commencing an action regarding new claims—60-day notice and a showing (when there is government involvement) that the government is not "diligently prosecuting" the action. If it is true that citizens must notify the EPA before commencing an action in the first instance, surely it is true that they must notify the EPA before commencing an action that turns on the alleged inadequacy (or alleged under-enforcement) of a consent decree proposed by and negotiated by that very agency. *See Atlantic States Legal Foundation, Inc. v. United Musical Instruments*, 61 F.3d 473, 478 (6th Cir. 1995) ("One of the important purposes of the notice requirement under environmental statutes is to facilitate dispute resolution by EPA negotiation [and thereby] reduce the volume of costly litigation.")

(quotation omitted). Generally speaking, when the contours of a private plaintiff's suit and the Government's suit coincide—as the district court determined they did here (and as the Ellises concede)—the former must be dismissed. *See EPA v. City of Green Forest, Arkansas*, 921 F.2d 1394, 1403–04 (8th Cir. 1990) (upholding district court decision to dismiss a private plaintiff's Clean Water Act claims that overlapped completely with a Government consent decree); *see also CLEAN*, 2000 WL 220464, at *17; *Lockett v. EPA*, 319 F.3d 678, 689 (5th Cir. 2003) ("[A]llow[ing] [the citizen] suit to proceed based on continued violations for which the [state agency] had already begun to take action would eviscerate the bar on citizen suits where the state is diligently prosecuting an action under comparable state law.").

The notice requirement is doubly important here because the Ellises not only sought to obtain an injunction on the same terms as the consent decrees but they also sought to obtain relief on "more stringent terms than those worked out by the EPA." *Green Forest*, 921 F.2d at 1404. Such second-guessing of the EPA's assessment of an appropriate remedy—a mere three months after the entry of the decrees—fails to respect the statute's careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has "failed" to do so, not where the EPA has acted but has not acted aggressively enough in the citizens' view. *See Gwaltney*, 484 U.S. at 61 (citizens cannot "seek the civil penalties that the [EPA] chose to forgo"); *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 356–57 (8th Cir. 1998) (private plaintiffs cannot "collaterally attack" a state environmental agency's decision that a certain level of civil penalties suffice for the same violations alleged in the citizen suit); *Orange Env't, Inc. v. County of Orange*, 923 F. Supp. 529, 540 (S.D.N.Y. 1996) (citizens cannot "overrule the judgment of the EPA and demand an additional and different type of remediation than that settled upon by the federal authorities").

In ruling to the contrary, the district court expressed concern that the Ellises may not directly enforce the consent decrees and have no apparent remedy for continued fugitive-dust problems because the EPA does not monitor the fugitive dust situation on a regular basis under the decrees. Why these concerns made a difference in this case, however, is not clear, as the court simultaneously granted the Ellises ample injunctive and monetary relief regarding the continuing fugitive dust under Kentucky nuisance law. Even if that relief had not been available, however, there are two answers to the district court's concern. As a starting point, it is well to remember that the Clean Air Act primarily serves public, not private, interests. Citizens acting as "private attorneys general" to enforce the Clean Air Act, as the phrase implies, seek relief not on their own behalf but on behalf of society as a whole, and accordingly "personalized" remedies are not a first priority of the Act. *See Orange Env't*, 923 F. Supp. at 539 (noting that "[t]he fact that the remediation order" in an environmental suit "does not meet the desires of private parties is not crucial," as the purpose of the Clean Water Act "is to provide *society* with a remedy," not to secure "personalized relief" for individuals).

More importantly, the Ellises and the public interest they represent are not without a federal remedy. Three avenues of relief remained open to them. The Ellises could have petitioned the EPA to enforce the consent decrees. They could have petitioned the EPA or the court to obtain a modification of the consent decree. And they could have filed a new lawsuit after supplying the requisite notice to the EPA, to Kentucky and to Harsco and Gallatin. What the Ellises cannot do once the EPA becomes involved is wait until the EPA has resolved its own claims against the polluter, then obtain stricter enforcement than the Government negotiated. If, in other words, the Ellises had notified the EPA that violations of the Clean Air Act had persisted after the entry of the consent decrees and if the Government did not enforce the decrees or otherwise prosecute these claims, the Ellises could file a new complaint (and comply with the statute's 60-day notice requirements, in part by showing that the Government is not "diligently prosecuting" its suit, *i.e.*, not enforcing the consent decrees). In view of the mere three months that elapsed between the entry of the consent decrees and the district court's injunction and in view of the Ellises' decision not to raise the issue with the EPA, it can hardly be said that the Government in this instance was unwilling or unable to enforce the decrees. *Cf. CLEAN*, 2000 WL 220464, at *12 (prosecutions under the Clean Air Act "are heavily presumed 'diligent'").

Also unavailing are the Ellises' arguments in defense of the district court's decision. They claim that (1) citizen plaintiffs "have the right to seek injunctive relief after a government settlement if the violations continue" and (2) notice to the EPA is not required for post-complaint violations "that are of the same type as those identified in the initial notice." Ellis Reply Br. at 26–28.

In support of their first proposition, *Eastman Kodak*, 933 F.2d at 127–28, and *Comfort Lake*, 138 F.3d at 355, say that citizen plaintiffs may maintain their lawsuits after the Government has resolved claims regarding earlier violations when there is a "realistic prospect" of the alleged violations continuing. But neither of these cases establishes that a court may issue a citizen-suit injunction when consent decrees concluded by the Government grant prospective injunctive relief covering the same ground, much less allow such claims before the decrees have been allowed to work. The Ellises have not drawn our attention to any case that allows private parties to seek relief that requires a court to revisit (and revamp) territory tread by environmental authorities three months earlier, particularly when those authorities have not even been told about the alleged violations.

In making their second argument—that additional violations that are part of an ongoing pattern need not independently comply with the statute's notice provisions—the Ellises again overlook the significance of the consent decrees. It may well be true that private plaintiffs need not send additional notice letters for violations of the "same type" once they have filed a complaint. *See Pub. Interest Research Group of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1250 (3d Cir. 1995). But because the Government's consent decrees required the dismissal of the Ellises' claims for injunctive relief of the "same type," the notice requirements for commencing a new suit (if the Ellises could demonstrate that the Government has actually failed to enforce the decrees) assuredly apply. *See* 42 U.S.C. § 7604(b) ("No action may be commenced . . . prior to 60 days after the plaintiff has given notice of the violation.").

## IV.

The Ellises challenge the district court's decision rejecting their federal permit claims that Gallatin and Harsco failed to get a PSD for their manufacturing operations. In the Ellises' view, Harsco violated this rule because it should have obtained a separate PSD permit for its slag-processing and dumping operations (it instead obtained a non-PSD air emissions permit for its slag-processing operations in 1995) and Gallatin and Harsco violated this rule because they should be considered a single "source," in which case Gallatin's PSD permit—which governs only its own operations and not Harsco's—is insufficient. *See* Compl. at JA 89–90.

Under the Clean Air Act, the two companies were "required" to obtain a permit before commencing operations that would lead to a "significant deterioration of air quality." 42 U.S.C. § 7604(a)(3); *see also id.* § 7475. As part of its state implementation plan approved by the federal EPA, Kentucky regulations provide that "[a] major stationary source or major modifications [to a source] . . . shall not begin actual construction until it obtains a permit stating that the stationary source or modification shall comply with [other provisions of the regulations]." 401 Ky. Admin. Reg. 51:017, § 8. A citizen may sue any person who builds or modifies a "major emitting facility" either without a required state permit or in violation of a condition imposed by an issued state permit. *See* 42 U.S.C. § 7604(a)(3).

In determining that the Ellises' PSD claims against Gallatin and Harsco could not go forward, the district court gave different reasons for the claim against each company. As to Gallatin, the court determined that the EPA's consent decree precluded any further litigation. That consent decree resolved the EPA's PSD claims against Gallatin—which the Ellises admitted were identical to their own—by deferring to the Kentucky Division of Air Quality and its administrative review process the question whether Gallatin's and Harsco's facilities operate as a single source for purposes of Gallatin's PSD permit. As to Harsco, while its consent decree with the Government did not resolve any permit-related claims, the district court determined that the Ellises' PSD claims constituted a "collateral challenge" to the state agency's permitting decisions that should not be litigated in federal court. D. Ct. Op. at 24 (Sept. 12, 2002).

## A.  Permit Claims against Gallatin

The Ellises raise one challenge to the district court's res judicata determination, claiming that "Gallatin waived any defense of res judicata by splitting its claim between federal and state proceedings." Ellis Br. at 53.  This contention, however, misconceives the rule against claim-splitting.  True, a plaintiff must join all claims arising from the same set of facts in a single proceeding and cannot split them across multiple fora.  *See* Restatement of Judgments (Second) § 24 (1982).  True also, when a plaintiff splits her claims and the defendant acquiesces in the claim-splitting, an adverse decision against the plaintiff in the first proceeding will not bar her claim in the second proceeding.  *Id.* § 26; *see Davis v. Sun Oil Co.*, 148 F.3d 606, 612 (6th Cir. 1998).  But that is not what happened here.  The Ellises did not attempt to litigate their PSD claims in two fora only to find themselves blocked by Gallatin's res judicata defense.  Instead, the Government and the Ellises litigated their identical claims in two separate lawsuits.  In view of the privity between these parties on these claims, the end to the Government's suit spelled the end to the Ellises' suit.

To the extent that the Ellises mean to argue that Gallatin waived its res judicata defense by continuing to litigate the claim in the state agency proceeding, that too is mistaken.  In presenting new information to the Kentucky Division of Air Quality in support of its permit and in continuing to litigate the PSD issue before that agency, Gallatin of course was merely complying with the consent decree, which deferred to the agency's determination regarding whether Gallatin and Harsco constituted a single source.

## B.  Permit Claims against Harsco

The Ellises claim that the district court erred by dismissing its PSD claims against Harsco for two reasons: (1) the district court's "collateral attack" theory is not supported by the Clean Air Act; and (2) their claim did not amount to a collateral attack because they "were *supporting*, not attacking" the state permitting decision, Ellis Br. at 52.  We disagree on both fronts.

In concluding that the Ellises were making a "collateral attack" on the state permitting process, the district court relied on two cases arising under the citizen-suit provisions of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)—*Greenpeace, Inc. v. Waste Technologies Indus.*, 9 F.3d 1174 (6th Cir. 1993), and *Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188 (6th Cir. 1995).  The first case, *Greenpeace*, does not appear to support the court's decision, as it relied on provisions of the statute that have no direct analog to the Clean Air Act.  *See id.* at 1180–81.  The second case, *Coalition for Health Concern*, does support the district court's decision.  Rather than dismiss the case on statutory interpretation grounds unique to the Resource Conservation and Recovery Act, the Court dismissed the case under the *Burford* abstention doctrine.  *See Coalition*, 60 F.3d at 1194–95; *see also Ada-Cascade Watch Co., Inc. v. Cascade Res. Recovery, Inc.*, 720 F.2d 897 (6th Cir. 1983) (deciding that under *Burford*, district court should have abstained from hearing hazardous waste permitting claim).  *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *see also New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359–62 (1989) [*NOPSI*] (describing *Burford* abstention); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814–815 (1976) (same).

*Burford* counsels abstention by federal courts "(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *NOPSI*, 491 U.S. at 361 (quotations omitted).  "[C]entralization of judicial review" offers one explanation for deferring to a "state's desire for a coherent public policy."  *Ada-Cascade Watch*, 720 F.2d at 905; *see also Burford*, 315 U.S. at 325; *Palumbo v. Waste Tech. Indus.*, 989 F.2d 156, 159–60 (4th Cir. 1993) (abstaining where State had "taken great care to provide for specialized adjudication of its complicated environmental law scheme" and through which State was considering plaintiffs' claim).

The reasons given by *Coalition for Health Concern* for applying *Burford* abstention apply with equal force here. As in that case, Kentucky "has enacted and is operating its own authorized program" under the Clean Air Act and "is attempting to establish a coherent policy under its law concerning . . . licensing" of emitting facilities. 60 F.3d at 1194–95. Kentucky has enacted its own state implementation plan including comprehensive PSD regulations that the EPA has approved, *see* 401 Ky. Admin. Regs. 51:017; 45 Fed. Reg. 6092 (Jan. 25, 1980), and provided a scheme for administrative and judicial review of the Kentucky Division of Air Quality's PSD permitting decisions, *see* Ky. Rev. Stat. Ann. § 224.10-420(2) & -470.

And as in *Coalition for Health Concern*, "federal review at this juncture would be disruptive of Kentucky's efforts to establish a coherent policy" with respect to PSD permitting of emitting facilities, particularly as the state agency and courts were reviewing the precise issue raised by the Ellises' federal permit claims at the time of the district court's opinion. 60 F.3d at 1194; *see also Palumbo*, 989 F.3d at 160. Federal review also would be disruptive here because it would require the district court to revisit earlier decisions made by the Kentucky Division of Air Quality that Harsco's operations did not require a PSD permit and that Gallatin and Harsco are not a single "major stationary source"—an issue committed by the Clean Air Act to state resolution. *See* 401 Ky. Admin. Regs. 51:017, §§ 1(25)(a) & 8; 55 Fed. Reg. 23547, 23548–49 ("In sum, states remain free to follow their own course, provided that state action is consistent with the letter and spirit of [their own state implementation plan].").

The Ellises' permit claims boil down to allegations that the Kentucky agency "failed to apply or misapplied [its] lawful authority under Kentucky law and under" the Clean Air Act by issuing Gallatin's PSD permit exclusive of Harsco's operations and by determining that a PSD permit was unnecessary with respect to Harsco. *Coalition for Health Concern*, 60 F.3d at 1195. As *Coalition for Health Concern* suggests, such administrative claims offer a classic explanation for applying *Burford* abstention. *See also NOPSI*, 491 U.S. at 362 (identifying "claim[s] that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors" as warranting *Burford* abstention).

Nor, contrary to the Ellises' contention, do *Weiler v. Chatham Forest Products, Inc.*, 370 F.3d 339 (2d Cir. 2004), and *Association to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007 (9th Cir. 2002), point to a different conclusion. The cases addressed whether the Clean Air Act in one instance and the Clean Water Act in the other eliminated federal-court jurisdiction over citizen suits that challenge state administrative decisions that a permit is not required—a question that both cases answered in the negative, *Weiler*, 370 F.3d at 345–46; *Hammersley*, 299 F.3d at 1011–12. We do not dispute this conclusion. *See* 42 U.S.C. § 7604(a)(3) (allowing citizens to sue "any person who . . . constructs any new or modified major emitting facility" without first obtaining a required PSD permit). But the question in this case is not whether citizens may sue companies that fail to obtain a PSD permit; they may and *Burford* abstention rarely will present an obstacle to those claims. The question here is whether a PSD permit was required (and what type of permit was required) in the setting of these associated plants. All we thus decide in this unusual context—where the state has supplied a concentrated and comprehensive review process that is currently addressing the very subject of these federal claims—is that *Burford* counsels abstention. Neither *Weiler* nor *Hammersley* rejected, let alone considered, *Burford*'s application in this setting.

The Ellises' second contention—that their claim does not suffer from any collateral attack or abstention problems because their claim "supports" rather than "attacks" the state decisions—is of little moment. The Kentucky Division of Air Quality earlier concluded that Gallatin and Harsco were not a single source, that Gallatin should receive a PSD permit without including Harsco's operations and that Harsco's operations did not require a PSD permit—conclusions with which the plaintiffs asked the district court to disagree. That the state agency subsequently reversed these determinations and is now considering Gallatin's and Harsco's appeals does not change matters. If the Ellises truly "supported" the state agency's permitting decisions, they would have had little if any reason for bringing this claim.

**V.**

The Ellises finally claim that the district court should have awarded them "necessary response costs" under CERCLA to compensate Richard and Thomas Ellis for the time they spent observing and videotaping Gallatin's and Harsco's operations from January 1997 through December 2000. In rejecting this claim, the district court noted that to recover any costs, the "citizens must prove" that the costs were not "primarily for litigation," D. Ct. Op. at 36 (Sept. 12, 2002), which it concluded they had failed to do, D. Ct. Op. at 7 (Oct. 8, 2002).

We agree with the district court that any costs "incurred" by the Ellises were not "necessary response costs" recoverable under CERCLA. CERCLA provides for recovery from liable persons of any "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Generally speaking, legal fees and litigation-related costs "are not recoverable"; only "work that is closely tied to the actual cleanup . . . may constitute a necessary cost of response." *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 549 (6th Cir. 2001); *see also* 42 U.S.C. § 9601(23)–(25) (defining "response" as "remove, removal, remedy, and remedial action" which in turn encompass "cleanup or removal of released hazardous substances" and "actions . . . to prevent or minimize the release of hazardous substances"); *Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 849–50 (3d Cir. 1995) (determining that litigation costs were not "response costs" because they were not "monies . . . expended to clean up sites or to prevent further releases of hazardous chemicals") (ellipsis in original). Even if the monitoring time spent by the Ellises constitutes proper costs incurred under the statute (which Gallatin and Harsco dispute), these costs were not closely tied to an actual cleanup but in the end were unrelated to any cleanup at all.

**VI.**

For these reasons, we affirm the judgment in part and reverse it in part and remand the case to the district court.