RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0104p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

STARLINK LOGISTICS, INC.,

                         *Plaintiff-Appellant*,

    *v.*

ACC, LLC fka Associated Commodities Corporation,

                       *Defendant-Appellee*.

No. 22-6118

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Columbia.
No. 1:12-cv-00011—Eli J. Richardson, District Judge.

Argued:  January 31, 2024

Decided and Filed:  May 7, 2024

Before:  BATCHELDER, CLAY, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Matthew C. Blickensderfer, FROST BROWN TODD LLP, Cincinnati, Ohio, for Appellant.  Sharon O. Jacobs, DICKINSON WRIGHT PLLC, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Matthew C. Blickensderfer, Christopher S. Habel, FROST BROWN TODD LLP, Cincinnati, Ohio, Lucas T. Elliot, FROST BROWN TODD LLP, Nashville, Tennessee, for Appellant.  Sharon O. Jacobs, Willam J. Haynes III, R. William Stout, SPENCER FANE LLP, Nashville, Tennessee, Kori Bledsoe Jones, MOUNGER & MOLDER, PLLC, Columbia, Tennessee, for Appellee.

     CLAY, J., delivered the opinion of the court in which DAVIS, J., joined in full, and BATCHELDER, J., joined in part.  BATCHELDER, J. (pp. 25–27), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

CLAY, Circuit Judge.  Plaintiff StarLink Logistics, Inc. ("StarLink") appeals the district court's dismissal of some of its claims for lack of jurisdiction and the district court's grant of summary judgment to Defendant ACC, LLC ("ACC") as to its remaining claims.  In January 2012, StarLink sued ACC for civil penalties, injunctive relief, and declaratory relief under the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365, and the Resource Conservation and Recovery Act, 42 U.S.C. § 6972, alleging that ACC's improperly closed landfill was polluting StarLink's land.  After StarLink initiated its suit, ACC and the Tennessee Department of Environment and Conservation ("Department") finalized a consent order requiring ACC to abate the landfill's pollution.  The overarching issue on appeal is what effect this consent order and ACC's subsequent compliance efforts have on StarLink's citizen suit.

In light of the consent order, the district court disposed of StarLink's claims.  With respect to ACC's alleged violations of the Clean Water Act and the Resource Conservation and Recovery Act occurring prior to the consent order, the district court dismissed StarLink's claims for injunctive and declaratory relief as moot and granted summary judgment to ACC as to StarLink's claims for civil penalties.  In the alternative to its mootness and civil penalties rulings, the district court concluded that it would have granted summary judgment to ACC as to all violations occurring prior to the consent order on the basis of claim preclusion.  With respect to violations occurring after the consent order, the district court dismissed StarLink's claims for failure to meet the Clean Water Act's and the Resource Conservation and Recovery Act's jurisdictional notice requirements.

For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

# I. BACKGROUND

## A. Factual Background

Plaintiff StarLink owns over one-thousand acres of land adjacent to and downstream from Defendant ACC's land, where ACC used to operate a landfill for byproducts of aluminum recycling. Although ACC's landfill stopped accepting new waste in 1993, and complied with the landfill's closure requirements by 1995, ACC has been required to manage the environmental effects of the landfill following its closure.

StarLink claims that ACC has failed to properly manage the closed landfill. It argues that pollutants from ACC's landfill have been spreading to StarLink's land through contaminated surface water, groundwater, and sediment runoff. The result, according to StarLink, has been a significant increase in pollution. For example, StarLink claims that before ACC's landfill opened, chloride concentrations in a lake on StarLink's land were well below Tennessee's legal limit. Yet, by 2012, chloride concentrations were purportedly over 127 times the maximum and, as of 2021, remain above the legal limit. StarLink describes a similar trend for ammonia concentrations, as well as other pollutants. Based on this, StarLink sued ACC in January 2012, alleging that pollution from ACC's landfill violated federal and state laws.

The merits of StarLink's suit are not directly at issue on appeal. Rather, the dominant issue is whether StarLink's suit can proceed given a 2012 consent order between ACC and the Tennessee Department of Environment and Conservation to address the polluting effects of the landfill. The 2012 consent order sought to remedy pollution from ACC's landfill by requiring ACC to divert uncontaminated water away from the landfill, relocate all of the landfill's waste, and develop a plan to reduce contamination and to monitor water quality. The consent order also imposed $400,000 in contingent penalties if ACC failed to satisfy certain milestone deadlines for waste relocation.

ACC complied with the steps set forth by the 2012 consent order, including relocating all of its landfill waste and building systems to divert uncontaminated water. Despite ACC's compliance, ACC and the Department acknowledged in 2016 that water samples entering StarLink's land "continue[d] to contain high levels of chlorides, ammonia, and total dissolved

solids." 2016 Suppl. Consent Order, R. 197-4, Page ID #2629. Thus, the Department took additional steps to address ACC's pollution, although the success of these steps in mitigating pollution has been unclear. In 2016, ACC and the Department agreed to a supplemental consent order that required ACC to develop interim and permanent plans to reduce pollution, as well as submit monitoring data to the Department. The Department later sued ACC for failure to comply with the 2016 order, although it eventually voluntarily dismissed the suit. In 2021, water running from ACC's land to StarLink's land still contained concentrations of pollutants that were significantly higher than those permitted by Tennessee's water quality regulations.

## B. Procedural History

### 1. StarLink's Initial Suit and the Stay of Federal Proceedings

In July 2011, in anticipation of filing a citizen suit against ACC under several federal environmental statutes, StarLink sent a letter of notice to ACC, the U.S. Environmental Protection Agency ("EPA"), and the Tennessee Department of Environment and Conservation. Approximately six months later, StarLink brought this suit against ACC in federal court, alleging that ACC's management of its landfill was resulting in the pollution of StarLink's land. StarLink sued ACC under Tennessee common law and three federal environmental statutes: the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*

This appeal pertains only to StarLink's Clean Water Act and RCRA claims because the district court consolidated StarLink's other claims with a separate action. As to the Clean Water Act and RCRA, StarLink specifically alleged that ACC was (1) discharging pollutants into navigable waters without a permit, in violation of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342 (Count 1); (2) discharging fill material into navigable waters without a permit, in violation of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1344 (Count 2); (3) engaging in open dumping of solid waste, in violation of RCRA, 42 U.S.C. §§ 6944(b), 6945 (Count 3); (4) violating the post-landfill closure requirements of Tennessee's solid waste management plan, *see* Tenn. Comp. R. & Regs. 1200-01-07-04 (2013), which was formed pursuant to RCRA, *see* 42 U.S.C. §§ 6944–

6947 (Count 4); and (5) managing solid waste in a manner that "present[ed] an imminent and substantial endangerment to health or the environment," in violation of RCRA, 42 U.S.C. § 6972(a)(1)(B) (Count 5). For these five counts, StarLink sought injunctive and declaratory relief, as well as civil penalties "of up to $32,500 per day per violation." Am. Compl., R. 61, Page ID #1150–54, 1158. While StarLink's complaint did not list each individual violation by ACC, the complaint defined what constituted a violation for the purposes of each count.

In light of the state administrative and judicial proceedings discussed below, StarLink's Clean Water Act and RCRA claims were stayed from 2013 to 2021 based on the doctrine of *Burford* abstention. *See Saginaw Hous. Comm'n v. Bannum, Inc.*, 576 F.3d 620, 625–26 (6th Cir. 2009) (discussing the abstention doctrine set forth by *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)).

### 2. The 2012 Consent Order and State Proceedings

In June 2011, before StarLink brought suit, the Tennessee Department of Environment and Conservation entered into a consent order with ACC to address the polluting effects of ACC's landfill. In August 2012, after StarLink opposed the 2011 agreement and initiated its suit, ACC and the Department entered into an amended and restated consent order ("the 2012 consent order") that revised the 2011 agreement. As discussed above, the 2012 consent order attempted to address the pollution flowing from ACC's landfill by requiring ACC to divert uncontaminated water from its landfill, relocate the landfill's waste, and develop a plan to reduce contamination.

Although the 2012 consent order is an administrative agreement, it was judicially reviewed. The 2012 consent order was first adopted as a final order of the Tennessee Solid Waste Disposal Control Board, after which the Board's decision was subject to final judicial review by the Tennessee Court of Appeals. *StarLink Logistics, Inc. v. ACC, LLC*, No. M2014–00362, 2018 WL 637941, at *1 (Tenn. Ct. App. Jan. 31, 2018). StarLink participated in these proceedings by successfully requesting to intervene in the Board's hearing regarding the consent order. StarLink then filed a petition for judicial review of the Board's decision in state court and was a named party in the subsequent state court proceedings, which upheld the Board's adoption

of the 2012 consent order. *See, e.g.*, *StarLink Logistics, Inc. v. ACC, LLC*, No. 12-1435, 2014 WL 7001397, at \*4 (Tenn. Ch. Jan. 29, 2014) (trial court proceedings).

### 3. Federal Proceedings After the Stay Is Lifted

In 2021, after the proceedings in state court had ended, the district court lifted the stay of federal proceedings in this case. ACC then filed a motion for judgment on the pleadings, and StarLink and ACC both filed motions for summary judgment.

In its opinion on the motions for summary judgment and motion for judgment on the pleadings, the district court reasoned that it was important to distinguish between alleged violations of the Clean Water Act and RCRA that occurred before the 2012 consent order and those that followed the 2012 consent order. The district court then determined that it lacked jurisdiction over any alleged violations that followed the 2012 consent order and dismissed them without prejudice. For these violations, the district court reasoned that StarLink had failed to provide notice required by the Clean Water Act's and RCRA's citizen suit provisions, and that this failure divested the court of jurisdiction. The district court also concluded that StarLink's claims for injunctive and declaratory relief as to violations predating the 2012 consent order were moot given ACC's compliance with the 2012 consent order. Lastly, the district court granted summary judgment to ACC with respect to StarLink's remaining claims—claims to recover civil penalties for violations predating the 2012 consent order—because they collaterally attacked the consent order's specified amount of civil penalties. In the alternative, the district court concluded that all claims for violations occurring before the 2012 consent order would be barred by claim preclusion.

Having done away with StarLink's suit through a combination of jurisdictional grounds and a summary judgment ruling, the district court denied ACC's motion for judgment on the pleadings as moot. After the district court entered judgment, StarLink timely appealed.

## II.  DISCUSSION

### A.  Mootness

We begin by addressing whether the controversy between StarLink and ACC has been rendered moot by the 2012 consent order.  The district court held that, with respect to pre-consent order violations, StarLink's claims for prospective relief were moot because, to comply with the 2012 consent order, ACC removed all waste and topsoil from the landfill and relocated it to another location.  On appeal, StarLink argues that contaminated soil below ACC's landfill continues to pollute StarLink's land, furnishing to StarLink a continued interest in seeking relief.

We review an issue of mootness *de novo*.  *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019).  A lawsuit is moot if there is no "live case or controversy at the time that a federal court decides the case."  *Id.* (quoting *Burke v. Barnes*, 479 U.S. 361, 363 (1987)).  The key inquiry "is whether the relief sought would, if granted, make a difference to the legal interests of the parties."  *Id.* at 410 (internal quotation marks and citation omitted).  This presents a heavy burden for ACC:  It must show that the 2012 consent order "completely and irrevocably eradicated" the pollution of StarLink's land.  *See Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021) (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)).

By relocating all landfill waste and topsoil to comply with the 2012 consent order, ACC no doubt took a significant step toward abating the pollution of StarLink's land.  However, StarLink claims that the landfill polluted the soil below it and that this contaminated soil continues to leach pollutants onto StarLink's land.  In other words, once the pollutants spread, the waste itself was only part of the problem.

The data support StarLink's point.  As the Tennessee Department of Environment and Conservation admitted, in 2016, samples of water entering StarLink's land from ACC's land still "continue[d] to contain high levels of chlorides, ammonia, and total dissolved solids."  2016 Suppl. Consent Order, R. 197-4, Page ID #2629.  Likewise, in 2021, according to a report by StarLink's expert, water running to StarLink's land from ACC's land contained over five times the legal limit of chloride.  By comparison, water upstream of the landfill only contained chloride amounts that were 1 to 2%—just a fraction—of that same legal limit.

These stark figures lead to the conclusion that prospective relief would still make a difference to StarLink. *See Sullivan*, 920 F.3d at 410. For example, a possible injunctive remedy may be for ACC to dispose of and replace the contaminated soil below the landfill, similar to remedies this Court has upheld in prior cases. *See, e.g.*, *Ohio ex rel. Yost v. Breen*, No. 22-3684, 2023 WL 3918496, at *3, *8 (6th Cir. June 9, 2023). To be sure, ACC's step of entering into and complying with the 2012 consent order has significant effects on StarLink's claims, including through doctrines such as claim preclusion, as discussed below. However, its actions alone are not enough to satisfy the heavy burden of rendering StarLink's claims moot given StarLink's allegations that pollution of its land is ongoing. *See Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 531 (6th Cir. 2001).

ACC argues that StarLink's counts are specifically premised on the landfill waste and therefore cannot be maintained based on the soil below the landfill. To the contrary, StarLink's claims flow more broadly from the improper closure of the landfill, which StarLink alleges has had cascading effects such as contaminating surface and groundwater flows. For example, Count 2 of StarLink's complaint claims that because ACC improperly closed its landfill, discharge or fill material flows from ACC's land onto StarLink's property. Contaminated soil, as a result of the improper closure, could surely sustain StarLink's claims for relief. Likewise, Count 5 contends that ACC's "mismanagement of its closed Landfill has caused, and continues to cause today, the escape of solid wastes, solid waste constituents, leachate, contaminated rainfall, and waste decomposition projects." Am. Compl., R. 61, Page ID #1154. Violations under Count 5 could continue through the contaminated soil, including by polluting StarLink's land through groundwater flows. *Cf. El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 870 (D.C. Cir. 2014) (holding federally funded cleanup of waste contamination site did not render RCRA claims moot where the cleanup did not address groundwater contamination).

The district court concluded that the soil below the landfill could not save StarLink's case from mootness for a different reason. It first decided that violations based on the soil below the landfill could not have occurred prior to the consent order "because the waste was still in the Landfill at that time." Mem. Op., R. 282, Page ID #5801. It then noted that, with respect to post-consent order violations, StarLink's claims—including those based on the soil—had to be

dismissed for failure to meet the Clean Water Act's and RCRA's jurisdictional notice requirements.

As an initial matter, our Court may address issues of justiciability in any order that it wishes. *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc). We think it prudent to first consider the foundational issue of whether this case is moot and to address separately whether any of StarLink's claims for post-consent order violations must be dismissed for failure to meet the Clean Water Act's and RCRA's jurisdictional notice requirements, an issue we discuss in great detail *infra* Section II.C.

Moreover, violations based on the soil undoubtedly could have occurred prior to the 2012 consent order. Pollutants from the landfill could have started to contaminate the soil below the landfill and spread into the groundwater prior to the 2012 consent order, as StarLink alleges. While StarLink alleges that the soil below the landfill continued to pollute its land after the consent order, it argues that the bottom layer of soil began contributing to pollution earlier. Indeed, this is one way that StarLink's expert, Charles McCulloch, claims that pollution is occurring.

In light of the above, the 2012 consent order did not render StarLink's claims moot.[1]

**B. Claim Preclusion**

We turn next to the possible preclusive effects of the 2012 consent order. With respect to pre-consent order violations, ACC argues that claim preclusion bars StarLink from relitigating its claims because StarLink could have raised these claims in the proceedings regarding the 2012 consent order. StarLink concedes that claim preclusion bars its claims for pre-consent order violations under Counts 1, 3, and 4. However, it argues that claim preclusion does not bar claims

---

[1]At oral argument, StarLink also argued that the 2012 consent order could not render moot its claims for the cleanup of its property because the consent order did not include this form of relief. Since we conclude that StarLink's claims are generally not rendered moot by the consent order, we need not address this separate point. Nonetheless, we note that this argument alone would face a separate jurisdictional hurdle: A citizen suit under the Clean Water Act must be based on ongoing violations, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987), and a number of courts have reasoned that the same is true for RCRA, *see, e.g.*, *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1010 n.20 (11th Cir. 2004). Even if some cleanup remained to be done for past violations, these cases suggest that this alone could not sustain a suit.

for pre-consent order violations under its remaining counts—Counts 2 and 5. StarLink also states that none of its claims are barred with respect to post-consent order violations.

Although the district court based its holding as to pre-consent order violations on mootness and the unavailability of civil penalties, it concluded that it would alternatively grant summary judgment to ACC with respect to pre-consent order violations on the basis of claim preclusion. We review a grant of summary judgment on the basis of claim prosecution *de novo*. *Dubuc v. Green Oak Township*, 312 F.3d 736, 743 (6th Cir. 2002).

Tennessee law governs the preclusive effect of the 2012 consent order, *see Stemler v. City of Florence*, 350 F.3d 578, 586 (6th Cir. 2003), and it provides that a claim that (1) "w[as] or could have been litigated in the former suit" is barred if (2) the former suit involved the same parties, and the prior judgment was (3) "final," (4) "on the merits," and (5) "involved the same cause of action" as the current suit. *See Creech v. Addington*, 281 S.W.3d 363, 376–77 (Tenn. 2009); *see also Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 577–78 (6th Cir. 2008). An administrative agreement that was subject to judicial review, such as the 2012 consent order, "is entitled to preclusive effect" if it satisfies the requirements of claim preclusion. *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 480 n.21 (1982) (citations omitted). We therefore evaluate these elements to determine whether the 2012 consent order had any preclusive effect on StarLink's case.**[2]**

The only meaningfully contested element of claim preclusion in this case is whether StarLink's claims "could have been litigated" in the proceedings over the 2012 consent order. *See Creech*, 281 S.W.3d at 376. The 2012 consent order satisfies the other elements of claim preclusion. StarLink does not contest that the 2012 consent order proceedings constitute a "former suit" for purposes of claim preclusion. The Tennessee Court of Appeals' order approving the 2012 consent order upheld the 2012 consent order on the merits, and it constituted a final judgment because it disposed of the case and the Tennessee Supreme Court and United States Supreme Court declined review. *See* Petition for Writ of Certiorari at *12, *StarLink Logistics, Inc. v. ACC, LLC*, 2018 WL 5819482 (Nov. 2, 2018) (No. 18-593) (acknowledging the

---

**[2]**Because the 2016 supplemental consent order in this case was not subject to final judicial review, it cannot have a preclusive effect, and the parties do not argue otherwise.

Tennessee Supreme Court's denial of StarLink's application for permission to appeal); *StarLink Logistics, Inc. v. ACC, LLC*, 140 S. Ct. 2738 (2020) (denying petition for writ of certiorari). Moreover, StarLink's suit arises out of the same circumstances as the 2012 consent order proceedings—ACC's landfill pollution—satisfying Tennessee's broad standard for whether two suits involve the same cause of action. *See Creech*, 281 S.W.3d at 381. Finally, this case at least arguably involves the same parties as the 2012 consent order proceedings because StarLink was a named party in the state judicial proceedings. *See Carson v. Challenger Corp.*, No. W2006-00558, 2007 WL 177575, at \*5 (Tenn. Ct. App. Jan. 25, 2007) (looking to whether a litigant was a named party in the prior action for claim preclusion purposes).

However, even if ACC satisfies the above elements, StarLink argues that neither Count 2 nor the remediation of its property, a remedy relevant to Counts 2 and 5, could have been litigated in the 2012 consent order proceedings, defeating claim preclusion for these counts. As explained below, because StarLink is correct, the 2012 consent order has no preclusive effect on Count 2, nor does it bar StarLink from seeking the remediation, in other words, cleanup of its property for Count 5.

### 1. Count 2

Count 2 of StarLink's complaint alleges that ACC discharged fill material into navigable waters without a permit, in violation of Section 404 of the Clean Water Act. *See* 33 U.S.C. § 1344; *see also* 33 U.S.C. § 1311. StarLink contends that this count could not have been litigated in the 2012 consent order proceedings because neither the Tennessee Solid Waste Disposal Control Board nor the reviewing state court had jurisdiction to enforce the Section 404 permitting requirement.[3]

---

[3]The 2012 consent order is a voluntary, private agreement between the Tennessee Department of Environment and Conservation and ACC. We therefore refer to the authority of the Tennessee Solid Waste Disposal Control Board, as opposed to the Tennessee Department of Environment and Conservation, because it was the Board who heard the parties' dispute over the consent order and had the authority to modify the order. *See StarLink Logistics*, 2014 WL 7001397, at \*3–4 (noting that the 2012 consent order was approved by the Board in a contested case hearing after StarLink and ACC failed to voluntarily reach an agreement). The Board's decision then furnished a basis for judicial review. *See* Tenn. Code Ann. § 4-5-314(a) (directing agencies to render final orders when deciding contested cases); *see id.* § 4-5-322 (permitting persons "aggrieved by a final decision in a contested case" to seek judicial review).

StarLink is correct. The Clean Water Act permits federal actors to delegate some authority to the states, including the administration of Section 404 permits for the discharge of dredged or fill material. Although the authority to issue a Section 404 permit originally lies with the Secretary of the U.S. Army Corps of Engineers, *see* 33 U.S.C. § 1344(a), the Secretary may transfer that authority to a state whose proposed permitting program is at least as stringent as the federal scheme, *see* 40 C.F.R. § 233.1(c); 33 U.S.C. § 1344(g). However, it is undisputed in this case that Tennessee has not assumed Section 404 permitting authority in this manner. *See U.S. Interactive Map of State and Tribal Assumption under CWA Section 404*, EPA, https://www.epa.gov/cwa404g/us-interactive-map-state-and-tribal-assumption-under-cwa-section-404 (last updated April 9, 2024).

Actors seeking to discharge dredged or fill materials in Tennessee must therefore seek a permit from the U.S. Army Corps of Engineers. And where the U.S. Army Corps of Engineers retains the authority to issue Section 404 permits, only the federal government has the corresponding authority to enforce the Section 404 permitting requirement. *See Enforcement under CWA Section 404*, EPA, https://www.epa.gov/cwa-404/enforcement-under-cwa-section-404 (last updated March 26, 2024) (noting that "[w]hen the U.S. Army Corps of Engineers (Corps) is the permitting authority, EPA and the Corps share Section 404 enforcement authority," but that "[w]hen a State or Tribe is the permitting authority, the State or Tribe is responsible for Section 404 enforcement authority."). Tennessee, including its agencies, therefore did not have jurisdiction to enforce a Section 404 permitting violation, and Count 2—which alleged such a permitting violation—could not have been litigated in the proceedings over the 2012 consent order.

ACC argues on appeal that claim preclusion nonetheless applies because it did not need to obtain a Section 404 permit. It specifically claims that any sediment runoff from its land does not constitute "fill material" under Section 404, that a Section 404 permit is not required when a party obtains a permit under Section 402 of the Clean Water Act, and that correspondingly its permit under Section 402 to discharge stormwater shields it from liability. However, these arguments go to the merits of Count 2, while the issue the parties briefed on summary judgment was claim preclusion, and ACC clearly frames its arguments as a matter of claim preclusion.

Because Tennessee could not address any Section 404 permitting violation through the 2012 consent order, claim preclusion does not bar Count 2. We give the district court the first opportunity to address the merits of Count 2 upon remand, as to which ACC may make any argument regarding the applicability of Section 404's permitting requirement.

The partial dissent concludes that because Count 2, as well as Count 5, arose from the same facts as the 2012 consent order, claim preclusion applies. But that only concerns the claim preclusion requirement that both suits involve the same cause of action. *See Creech*, 281 S.W.3d at 380–381. Whether a claim was or could have been litigated in a prior suit is a separate requirement of claim preclusion. *See Winget*, 537 F.3d at 577–78; *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987). And it turns on the "legal possibility" of bringing a claim. *See United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 416 (6th Cir. 2016) (involving Ohio's identical requirement for claim preclusion that a claim was or could have been previously litigated).

The Tennessee Solid Waste Disposal Control Board lacked the authority to enforce the Section 404 permitting requirement, and the reviewing state court could not reject the 2012 consent order for failing to include a permitting requirement that was beyond the Board's jurisdiction. *See Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 456 (Tenn. 1995) (explaining the manner in which judicial review of Tennessee agency decisions is circumscribed). Count 2 therefore could not have been litigated in the 2012 consent order proceedings. Nor could StarLink's requested relief for Count 5, as we address below.

### 2. Count 5

StarLink argues that claim preclusion does not bar it from seeking remediation, in other words, cleanup of its property as a form of relief for Counts 2 and 5. Because we conclude above that claim preclusion does not bar any relief for Count 2, we need only address StarLink's arguments regarding remediation for the purposes of Count 5. Count 5 of StarLink's complaint alleges that ACC has disposed of solid waste in a manner that "present[s] an imminent and substantial endangerment to health or the environment," in violation of RCRA. *See* 42 U.S.C. § 6972(a)(1)(B).

Claim preclusion does not bar a subsequent claim if "the full measure of relief" a party seeks could not be obtained in the first suit. *Lien v. Couch*, 993 S.W.2d 53, 56 (Tenn. Ct. App. 1998). And in this case, the parties dispute whether the remediation of StarLink's property was available as a form of relief in the 2012 consent order proceedings. No Tennessee Supreme Court case addresses this issue, so we look to the decisions of the Tennessee Court of Appeals to predict how the Tennessee Supreme Court would rule, which reveal that remediation of StarLink's property was not an available form of relief in the proceedings over the 2012 consent order. *See Mich. First Credit Union v. CUMIS Ins. Soc'y, Inc.*, 641 F.3d 240, 252 (6th Cir. 2011).

In *Wayne County v. Tennessee Solid Waste Disposal Control Board*, the Tennessee Court of Appeals addressed the Tennessee Solid Waste Disposal Control Board's authority to issue private remedial relief. 756 S.W.2d 274 (Tenn. Ct. App. 1988). In that case, in a dispute over water contamination by a county landfill, the Board ordered the county to provide a family with uncontaminated water. *Id.* at 281. Reviewing the Board's order, the Tennessee Court of Appeals concluded that the Board did not have the authority to provide this form of relief. *Id.* Interpreting the statute from which the Board derived its power, the Solid Waste Disposal Act, *see* Tenn. Code Ann. § 68-211-111, the court unequivocally pronounced that the Act did not give the Board "the authority to grant remedial relief to private parties." *Wayne County*, 756 S.W.2d at 283. The Act neither expressly provided for this authority, nor was the ability "to provide private remedies" necessary and proper to fulfilling the Board's mission of protecting the public. *Id.*

Applying *Wayne County*, StarLink is correct that remediation of its property, a form of private remedial relief, was not available to it in the 2012 consent order proceedings. *Wayne County* forecloses this remedy by broadly declaring that the Tennessee Solid Waste Disposal Control Board has no authority to provide private remedial relief.[4] *See id.* at 283. The Solid

---

[4]We note that in addition to the Tennessee Solid Waste Disposal Act, which was the focus of *Wayne County*, the 2012 consent order was formed pursuant to the Tennessee Hazardous Waste Management Act, Tenn. Code Ann. § 68-212-101 *et seq.*, and the Tennessee Water Pollution Control Act, Tenn. Code. Ann. § 69-3-101 *et seq.* While *Wayne County* only interpreted the Board's authority under the Tennessee Solid Waste Disposal Act, that distinction makes no difference. Although the Board also has authority under the Hazardous Waste Management Act, that Act similarly does not contemplate private remedial relief and, if anything, forecloses it.

Waste Disposal Control Board—the exact same entity whose authority was at issue in *Wayne County*—therefore had no authority to order remediation of StarLink's property when adopting the 2012 consent order as a final order. Claim preclusion therefore cannot bar StarLink from seeking this form of relief for Count 5, because the Board could not grant to StarLink the full measure of relief that it sought. *See Lien*, 993 S.W.2d at 56.

Nor could the reviewing Tennessee court modify the consent order to require remediation of StarLink's property, contrary to the district court's conclusion. When reviewing a final agency order, such as an order of the Tennessee Solid Waste Disposal Control Board, the Tennessee judiciary's role is circumscribed. A reviewing court can only modify the decisions of a Tennessee agency if the "decisions (1) violate constitutional or statutory provisions; (2) exceed the agency's statutory authority; (3) were made 'upon unlawful procedure;' or (4) are arbitrary, capricious, or an abuse of discretion, and prejudice the party." *Richardson*, 913 S.W.2d at 456 (citation omitted); *see also* Tenn. Code Ann. § 4-5-322(h). Because the Board would be correctly acting within its scope of authority by not ordering remediation, a state court reviewing the Board's order would have no jurisdiction to modify the decision on this basis.

ACC argues that a non-final version of the 2012 consent order actually included at least some reference to remediation and that it was StarLink who asked to remove it at the hearing regarding the order. But the relevant question is whether StarLink could have received the "*full measure of relief*" it wanted in the 2012 consent order proceedings. *See Lien*, 993 S.W.2d at 56 (emphasis added). And should StarLink have sought additional or different remediation efforts than what ACC and the Tennessee Department of Environment and Conservation voluntarily agreed to, applying *Wayne County*, the Board would have been unable to order such relief. In other words, when a defendant and a state agency voluntarily agree to throw a plaintiff a conciliatory bone, the plaintiff's legal right to pursue the type and scope of remedies to which it may be entitled does not disappear. Under these conditions, StarLink may have understandably sought to preserve its ability to argue all issues regarding remediation in separate proceedings. For the purposes of claim preclusion, "there is a critical distinction between the remedies *sought*

---

*See id.* § 68-212-224(a)(1) (providing that a voluntary consent order "may not be employed with a person who generated, transported or released contamination that is to be addressed at the site").

and the remedies *available*. A litigant has no right to split his claim by voluntarily choosing to seek only some of the remedies available to him, but that is not really a choice when it is thrust upon him by procedural rules." *Passaro v. Virginia*, 935 F.3d 243, 251–52 (4th Cir. 2019). In this case, the choice was thrust upon StarLink, who would have been otherwise limited in the 2012 consent order proceedings to whatever remediation ACC and the Tennessee Department of Environment and Conservation chose to voluntarily throw its way.

For these reasons, claim preclusion does not bar StarLink from seeking remediation of its property for the purposes of Count 5, assuming it can maintain a RCRA claim on this basis. However, as to Count 5, StarLink is limited to seeking remediation. Even if claim preclusion is not appropriate with respect to a particular remedy, a litigant "may [only] return to court to seek remedies that were unavailable to him in the first proceeding." *Id.* at 252; *see also Harris v. County of Orange*, 682 F.3d 1126, 1133 (9th Cir. 2012) ("[C]laim preclusion does not bar a second action for damages, where a damages remedy was unavailable in the first action."); Restatement (Second) of Judgments § 26 cmt. c (Am. L. Inst. 1982) (When "formal barriers in fact existed and were operative against a plaintiff in the first action," the plaintiff "can present those phases of the claim which he was disabled from presenting in the first" action.).

### 3. Post-Consent Order Violations

Although the district court only applied claim preclusion to violations preceding the 2012 consent order, StarLink also notes that none of its claims for violations following the 2012 consent order are barred by claim preclusion. StarLink is correct because post-consent order violations could not have been addressed in the proceedings regarding the 2012 consent order because they, by definition, arose after the order was finalized. They therefore are not claims that "were or could have been litigated in the former suit," rendering claim preclusion inapplicable. *See Creech*, 281 S.W.3d at 376.

### 4. ACC's Collateral Attack Arguments

Lastly, ACC argues that StarLink's arguments about the inability to enforce a Section 404 permit and to seek remediation in the 2012 consent order proceedings somehow collaterally attack the Tennessee Department of Environment and Conservation's issuance of a Section 402

permit to ACC.  The district court described ACC's collateral attack argument as "largely unintelligible," and we are inclined to agree.  *See* Mem. Op., R. 282, Page ID #5820 n.42.

Our conclusion today in no way attacks the Department's authority to make Section 402 permitting decisions.  Deciding that Tennessee could not issue a Section 404 permit or that the Board could not order remediation does not challenge the validity of a Section 402 permit. Insofar as any Section 402 permit ACC holds shields it from the need to obtain a Section 404 permit, as discussed above, we give the parties an opportunity to brief the merits of Count 2 on remand, where ACC may make these arguments.

\* \* \* \*

In sum, the 2012 consent order has no preclusive effect on Count 2, on StarLink's ability to seek remediation of its property for Count 5, or on any claims for post-consent order violations.  But as StarLink concedes, with respect to pre-consent order violations, the 2012 consent order precludes Counts 1, 3, and 4.

## C.  Notice

We now turn to the issue of notice, which is among the requirements for a private plaintiff to bring a suit under the Clean Water Act and RCRA.  With respect to violations following the consent order, the district court dismissed StarLink's claims on the grounds that StarLink had failed to provide adequate notice, thereby divesting the court of jurisdiction.  *See Walls v. Waste Res. Corp.*, 761 F.2d 311, 316 (6th Cir. 1985) (holding that the Clean Water Act's and RCRA's notice provisions are jurisdictional requirements for citizen suits under each statute).

The statutory requirements for notice are set forth in the Clean Water Act's and RCRA's respective citizen suit provisions.  The Clean Water Act's citizen suit provision, 33 U.S.C. § 1365, establishes that a plaintiff must provide sixty days' notice to the defendant, to the EPA, and to the relevant state.  *Id.* § 1365(b)(1)(A).  A plaintiff who provides sixty days' notice may commence an enforcement action unless "the Administrator or State . . . is diligently prosecuting a civil or criminal action in a court of the United States, or a State" against the

defendant for that violation. *See id.* § 1365(b)(1)(B). Similarly, RCRA also requires notice—either sixty or ninety days depending on the violation—and prohibits citizen suits where a government actor is "diligently prosecuting" a suit "in a court of the United States or a State." 42 U.S.C. § 6972(b)(1)(A)–(B).

The purpose of these citizen suit provisions is to create an avenue for "vigorous enforcement" of the Clean Water Act and RCRA if "Federal, State, and local agencies fail to exercise their enforcement responsibility." *See* S. Rep. No. 92-414, at 64 (1971) (discussing the Clean Water Act's citizen suit provision). As this reflects, the primary responsibility for enforcement lies with the government, and the function of citizen suits is "interstitial." *See Gwaltney*, 484 U.S. at 61. But when the government fails, citizen suits serve an important role in environmental enforcement, *see id.*, permitting individual plaintiffs to step into the government's shoes and function as "private attorneys general." *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004).

The notice requirement for citizen suits reinforces this division of responsibility. The required sixty-day to ninety-day waiting period "allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits." *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989) (citation omitted); *see also Atl. States Legal Found. v. United Musical Instruments*, 61 F.3d 473, 478 (6th Cir. 1995) (stating that an "important purpose[] of the notice requirement under environmental statutes is to facilitate dispute resolution by EPA negotiation [and thereby] reduce the volume of costly litigation" (internal quotation marks and citation omitted) (second alteration in original)). The separate "diligent prosecution" bar to citizen suits similarly underscores the government's primary role in enforcement by preventing private plaintiffs from commencing a suit altogether if the government has initiated an enforcement action regarding the alleged violations prior to the plaintiff's suit.

We have previously suggested that once a plaintiff properly notices and initiates a citizen suit, the plaintiff's original round of notice ordinarily will cover "[subsequent] violations of the 'same type'" as those identified in the complaint. *See Ellis*, 390 F.3d at 478. However, we have also recognized that a plaintiff may have renewed obligations to provide notice if the government

reaches a settlement with the defendant over the issues raised by the plaintiff's suit. *See id.* In *Ellis*, this Circuit opined on that exact issue in the context of the Clean Air Act's sixty-day notice requirement, *see* 42 U.S.C. § 7604(b)(1)(A).[5] 390 F.3d at 466, 474. In that case, once the plaintiffs had provided notice of their anticipated suits against the defendants, the EPA initiated an enforcement action against the same defendants in federal court. *Id.* at 468. After the plaintiffs intervened in the EPA's litigation and filed their own actions, the EPA and the defendants entered into consent decrees that covered the same grounds as the plaintiffs' suits. *Id.* at 468–69.

The *Ellis* Court held that, to the extent that the plaintiffs sought relief for violations of the Clean Air Act following the consent decrees, they were required to provide an additional round of notice. *Id.* at 478. First, the Court determined that for violations occurring before the consent decrees, the plaintiffs' claims had to be dismissed because the consent decrees covered those grounds. *Id.* at 476. What was left—claims for violations following the consent decrees—was essentially a new lawsuit challenging the effectiveness of the consent decrees. And "[i]f it is true that citizens must notify the EPA before commencing an action in the first instance, surely it is true that they must notify the EPA before . . . an action that turns on the alleged inadequacy (or alleged under-enforcement) of a consent decree proposed by and negotiated by that very agency." *Id.* (citation omitted).

The additional notice served important purposes in *Ellis*. It gave the consent decrees a chance to operate before the plaintiffs could challenge their efficacy. *See id.* at 476–78. It also alerted government actors to the possible need to pursue additional corrective measures when those actors may have otherwise assumed their work was done. *See id.* And despite dismissing the plaintiffs' claims, the *Ellis* Court concluded that the plaintiffs were not without recourse. They "could have petitioned the EPA to enforce the consent decrees," "petitioned the EPA or the court to obtain a modification of the consent decree," or "filed a new lawsuit after supplying the requisite notice." *Id.* at 477. "If, in other words, the [plaintiffs] had notified the EPA that violations of the Clean Air Act had persisted after the entry of the consent decrees and if the

---

[5]Like the Clean Water Act and RCRA, the Clean Air Act also bars citizen suits if the EPA or a state is "diligently prosecuting" a suit against the same defendant for the same alleged violations. *See* 42 U.S.C. § 7604(b)(1)(B).

Government did not enforce the decrees or otherwise prosecute these claims, the [plaintiffs] could file a new complaint . . . ." *Id.*

Our holding regarding the consent decrees in *Ellis* squarely applies to the judicially reviewed 2012 consent order in this case, with the exception of two counts discussed below. Like the consent decrees in *Ellis*, the Tennessee Department of Environment and Conservation entered into the 2012 consent order with ACC to resolve pollution stemming from ACC's landfill. Similarly, too, the 2012 consent order covers many of the same grounds as StarLink's complaint and, importantly, requires dismissal of most of StarLink's pre-consent order claims on the basis of claim preclusion. *See id.* at 478. Thus, to the extent that StarLink alleges that ACC committed violations after the consent order, StarLink's claims act like a new lawsuit that challenges the consent order's adequacy. Notice, therefore, would permit the consent order to operate and alert the Department to the need for additional action. *See id.* at 476–78.

Dismissal, however, is improper with respect to Count 2 and remediation of StarLink's property sought for Count 5. As discussed *supra* Section II.B, neither Count 2 nor remediation sought for Count 5 was or could have been addressed as part of the consent order. And because these counts could not have been addressed by the consent order, neither count second-guesses or turns on the adequacy of the consent order. These counts therefore do not implicate the central concern in *Ellis*—that a citizen suit in which the plaintiff steps into the government's shoes may second-guess a settlement agreement by that same government. Thus, as to any post-consent order violations under Count 2 and for remediation of StarLink's property under Count 5, a second round of notice is not required and StarLink's claims should not be dismissed.

StarLink points to several ways in which this case differs from *Ellis*. It claims that, unlike in this case, "[t]he federal claims in the *Ellis* citizen suit were blocked entirely by the pending government enforcement action," which the EPA initiated within the sixty-day window following plaintiffs' notice. Appellant's Reply Br. at Page ID #18. However, the *Ellis* Court made clear that it was the consent decrees, and not the EPA's enforcement action, that triggered the requirement for an additional round of notice. *See Ellis*, 390 F.3d at 478. And while the *Ellis* defendants could have argued that the EPA's enforcement action impacted other requirements for a citizen suit—such as whether the EPA or a state was diligently prosecuting a

suit against the same defendant, *see* 42 U.S.C. § 7604(b)(1)(B)—those were simply not the grounds on which *Ellis* was decided.

Relatedly, StarLink argues that because the consent decrees in *Ellis* followed an enforcement action in federal court, the plaintiffs in that case had a full and fair opportunity to intervene in the proceedings.  Yet in this case, StarLink also participated:  It successfully intervened in the hearing before the Tennessee Solid Waste Disposal Control Board, in which the Board considered whether to adopt the consent order as a final order of the Board, and was able to submit evidence and present witnesses.  *See* Tenn. Code Ann. § 68-211-113(e) (2011) (amended 2013).  StarLink was then a named party in the subsequent state court judicial review of the Board's decision, *see StarLink Logistics*, 2014 WL 7001397, at *4.  Under these circumstances, we decline to engage in formalism for formalism's sake by distinguishing between a consent decree like those in *Ellis* and the judicially reviewed consent order in this case.  Like in *Ellis*, StarLink was able to meaningfully participate in the proceedings regarding the 2012 consent order.

StarLink claims that its position is supported by *Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239 (3d Cir. 1995).  In that case, the Third Circuit concluded that the plaintiff's original notice letter was specific enough to cover violations of the Clean Water Act that occurred after the complaint was filed.  *Id.* at 1250–51.  But *Hercules* is not binding on this Court, whereas *Ellis* is.  We must follow *Ellis*' conclusion that the existence of a consent decree or similar government action alters the plaintiff's notice obligations, even though a plaintiff ordinarily may not need to provide additional notice of similar violations once the complaint is filed.  *See Ellis*, 390 F.3d at 476.

Finally, on appeal, the parties dispute another jurisdictional issue:  Whether the 2012 consent order was a form of diligent prosecution by the state that prohibited a suit for post-consent order violations.  However, we need not address this separate and distinct jurisdictional bar to citizen suits, *see* 33 U.S.C. § 1365(b)(1)(A), (B) (treating these as separate requirements in the context of the Clean Water Act); 42 U.S.C. § 6972(b)(1)(A), (B) (same for RCRA).

As reflected by the above, we dismiss StarLink's claims for post-consent order violations based on a lack of adequate notice.**[6]**

In light of the 2012 consent order, StarLink was required to provide notice of any claims for post-consent order violations, insofar as the consent order precluded its pre-consent order claims, leaving functionally a new suit second-guessing the consent order. StarLink did not provide such notice. Therefore, with respect to post-consent order violations, StarLink's claims must be dismissed for lack of jurisdiction, except for Count 2 and remediation of StarLink's property sought for Count 5. Neither of these counts could have been addressed by the consent order, and therefore alleging post-consent order violations under these counts does not second-guess the 2012 consent order.

### D. CERCLA

On appeal, ACC very briefly raises another jurisdictional issue, suggesting that StarLink's suit is barred because federal courts lack jurisdiction over removal and remedial actions under §§ 104 and 113(h) of CERCLA. According to ACC, the 2012 consent order triggers these jurisdictional bars. We need not dwell for long on this issue. StarLink is correct that the 2012 consent order was not enacted pursuant to CERCLA, is not a removal or remedial action ordered under §§ 104 and 113(h), and that StarLink's suit does not seek to revise the 2012 consent order. The district court rejected this same argument by ACC about CERCLA multiple times on these bases and we decline to revisit these rulings.

### E. Civil Penalties

Having concluded that StarLink may proceed on Count 2 and for remediation of its property on Count 5, we address whether StarLink may seek civil penalties "of up to $32,500 per day per violation" on behalf of the government. Am. Compl., R. 61, Page ID #1150; *see also* 33

---

**[6]**Relatedly, ACC argues that the issue of diligent prosecution was decided in ACC's favor in the state court proceedings and that, under the doctrine of issue preclusion, it must therefore be decided in ACC's favor in this lawsuit. However, the Tennessee courts did not decide the issue of whether the 2012 consent order constituted "diligent[] prosecut[ion]," a phrase used by the Clean Water Act and RCRA, as a matter of federal law. *See Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009) (requiring "that the issue to be precluded is identical to an issue decided in an earlier proceeding"). The state court proceedings only considered whether the 2012 consent order was permissible and whether it was arbitrary and capricious—not whether it was diligently prosecuted—and, in any case, considered these issues as a matter of state law. *See StarLink Logistics*, 2018 WL 637941, at *7.

U.S.C. § 1365(a); 42 U.S.C. § 6972(a). ACC urges this Court to hold that StarLink cannot recover civil penalties because Tennessee has already exercised the remedy of civil penalties through the 2012 consent order.

This Court's case law does not directly address this issue. Instead, ACC urges this Court to adopt the Eighth Circuit's holding in *Comfort Lake Association, Inc. v. Dresel Contracting, Inc*, 138 F.3d 351 (8th Cir. 1998). In that case, the court held that civil penalties were unavailable in a citizen suit under the Clean Water Act given a state administrative agreement requiring the defendants to pay $12,203 in civil penalties for the same violations alleged in the citizen suit. *Id.* at 356–57. Permitting the private plaintiffs to seek civil penalties, the court reasoned, would amount to a collateral attack on the state agency's agreement because the agreement covered the same issues as the citizen suit and already imposed such a remedy. *Id.* Although the plaintiffs sought steeper civil penalties than the state agency—$25,000 per day for each violation—the court concluded that the agency "ha[d] the primary responsibility for enforcing the Clean Water Act" and its choice of penalties "[wa]s entitled to considerable deference." *Id.* at 357.

We need not decide today whether to adopt the reasoning of *Comfort Lake*. Given our claim preclusion and jurisdictional rulings above, StarLink can only proceed with Count 2 and to seek remediation of its property for Count 5. In light of that, Count 5 does not implicate civil penalties at all. While StarLink does seek civil penalties for Count 2, *Comfort Lake* does not apply. Because Count 2 could not have been addressed by the consent order, *see supra* Section II.B.1, it does not collaterally attack the Tennessee Department of Environment and Conservation's choice of penalties for the issues addressed by the consent order, thereby obviating the key issue in *Comfort Lake*. The Department could only seek civil penalties for issues it had the jurisdiction to address, which do not include Count 2. For Count 2, StarLink can therefore seek civil penalties.

## F. ACC's Motion for Judgment on the Pleadings

Lastly, we turn to ACC's motion for judgment on the pleadings. The district court concluded that this motion was moot given its rulings, and the same is largely true on appeal.

Because ACC's motion for judgment on the pleadings raises almost wholly the same issues as its motion for summary judgment, our rulings render it practically entirely moot.

The only additional issue raised by ACC's motion for judgment on the pleadings, and mentioned on appeal, is whether StarLink may seek damages for certain counts. But StarLink agrees that it cannot seek damages for its Clean Water Act and RCRA claims.

ACC's motion for judgment on the pleadings also raises the issue of whether this suit is barred under the *Rooker-Feldman* doctrine as a collateral attack on the state court judgment affirming the 2012 consent order. However, ACC does not raise the *Rooker-Feldman* doctrine on appeal. Although the *Rooker-Feldman* doctrine cannot be forfeited because it pertains to a federal court's subject matter jurisdiction, courts need only "evaluate its applicability *sua sponte* if it is a concern." *Vuyanich v. Smithton Borough*, 5 F.4th 379, 385 (3d Cir. 2021); *see also Neff v. Flagstar Bank*, 520 F. App'x 323, 326 (6th Cir. 2013). The district court properly rejected ACC's *Rooker-Feldman* doctrine arguments below, and we see no reason to revisit the issue.

## III.  CONCLUSION

Based on a combination of jurisdictional rulings and a grant of summary judgment to ACC, the district court concluded that StarLink could not proceed with any of its five counts. We disagree in part and hold that StarLink can proceed with Count 2 and to seek remediation of its property for Count 5 of its complaint.

As to Counts 1, 3, and 4, we agree with the district court's claim preclusion and notice rulings. With respect to pre-consent order violations, StarLink concedes that the district court correctly held that the 2012 consent order precluded Counts 1, 3, and 4. And with respect to post-consent order violations under Counts 1, 3, and 4, we agree with the district court that StarLink failed to satisfy the Clean Water Act's and RCRA's notice requirements.

Accordingly, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's judgment and **REMAND** for proceedings consistent with this opinion.

---

**CONCURRENCE / DISSENT**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part.  The majority holds that the district court erred by dismissing Counts 2 and 5 of StarLink's complaint, in which StarLink invoked the citizen-enforcement provisions of the Federal Clean Water Act (CWA) and Resource Conservation and Recovery Act (RCRA), respectively.  Because I agree with the analysis and conclusions in the district court's opinion, I respectfully disagree.  I would affirm the district court in its entirety and, therefore, I concur in all other respects.

In July 2011, StarLink sent to USEPA and TDEC the required notice of its intent to invoke the citizen-enforcement provisions of the CWA and RCRA, and in January 2012, filed this lawsuit against ACC.  Subsequently, TDEC and ACC entered an Administrative Consent Order (the "2012 Consent Order") to govern ACC's cleanup of the property to TDEC's satisfaction.  In the ensuing Tennessee State Court proceedings, ACC and TDEC obtained a final judgment confirming the Order, overcoming StarLink's participation and vigorous objection.  For practical purposes, the 2012 Consent Order is TDEC's approval of ACC's cleanup plan and, ultimately, its cleanup.

Despite ACC's cleaning up the pollution to TDEC's satisfaction and the Tennessee Court's rendering judgment approving that clean up, StarLink was not satisfied and, therefore, sought to reinstate and pursue its CWA and RCRA citizen-enforcement-provisions lawsuit.  But the district court determined that StarLink could not establish federal jurisdiction to prosecute these claims.  *See StarLink Logistics Inc. v. ACC, LLC*, 642 F. Supp. 3d 652, 665 (M.D. Tenn. 2022).

Any claims in StarLink's suit that were based on conditions or events prior to the 2012 Consent Order either were or could have been litigated in the Tennessee State Court proceedings and, therefore, were barred by claim preclusion.  *Id.* at 700-06.  Thus, claim preclusion barred all the claims in the January 2012 complaint, and StarLink had no viable claims in its lawsuit.

In holding that the Tennessee State Court proceedings on the 2012 Consent Order comprise the same cause of action as the citizen-suit claims here, the district court explained:

> In analyzing this element of claim preclusion the Court focuses on facts, not legal theories, to determine whether an action is precluded. . . . [I]t does not matter that the specific legal theories asserted in the State Court Action were under Tennessee laws, whereas the specific legal theories in this action are under federal laws (the CWA and RCRA). The salient question is simply whether the 'cause of action' extinguished in the State Court Action encompassed the same 'transaction'—that is, the same 'natural grouping or common nucleus of operative facts'—as that from which [StarLink]'s present claims arise.

*Id*. at 706 (editorial marks, quotation marks, citations, and paragraph break omitted). And the two lawsuits here arose from the same *nucleus of operative fact*, "namely, the fact that the Landfill was discharging leachate and sediment into navigable Waters of the United States . . . without the proper permits . . . [and the] failure to obtain those same permits . . . [or] properly operate and close the landfill, have . . . resulted in the discharge of pollutants." *Id*. at 705.

StarLink argued that Counts 2 and 5 could not be precluded because Tennessee had no authority to issue permits for filling of navigable waters under the CWA or to order ACC to remediate StarLink's property under RCRA. But, as just discussed, this improperly focuses on legal theories, rather than the facts. This also misunderstands the authority that matters. It did not matter that Tennessee could not have granted a CWA permit or overseen a RCRA clean up on StarLink's property; the Tennessee Courts had the authority to reject the proposals for the 2012 Consent Order until the court was satisfied. As the district court said here:

> The State Court Action was brought under Tennessee's Uniform Administrative Procedures Act, under which, the court may reverse or modify the decision of the agency if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are in violation of constitutional or statutory provisions. Thus, if the Tennessee state courts had determined that the CWA and/or RCRA warranted declaratory or coercive relief or civil penalties different from those in the 2012 Consent Order, they had the power to reverse or modify the Board's decision to adopt the 2012 Consent Order as appropriate to comply with the CWA and RCRA.

*Id*. at 706 n.39 (editorial marks, quotation marks, and citations omitted). That is, the Tennessee Courts could have sided with StarLink and rejected the 2012 Consent Order unless and until ACC (and TDEC) agreed to add requirements for ACC to get a CWA permit or enter a RCRA

cleanup under USEPA governance. StarLink argued or could have argued these claims in the Tennessee State Court proceedings. Claim preclusion bars StarLink from relitigating these claims here.

Because claim preclusion barred all the claims in StarLink's January 2012 complaint, StarLink had no claims left in its lawsuit. Moreover, any claims based on conditions or events that occurred *after* the 2012 Consent Order—i.e., after ACC had cleaned up the site to TDEC's satisfaction—were actually claims that TDEC had not properly crafted or enforced the 2012 Consent Order. These were, in fact, claims against TDEC as much as or more than they were claims against ACC. But more importantly, they were new and different claims from those in the January 2012 complaint or the July 2011 notice to USEPA and TDEC. These new claims required a new citizen-enforcement-provision lawsuit. And, to satisfy the citizen-enforcement provisions of CWA and RCRA, StarLink had to provide a new notice to USEPA and TDEC of its intent to file a new lawsuit based on those new claims, which it did not do. *Id*. at 692-94.

Because I believe the district court correctly analyzed and decided this case, I would affirm the entire judgment. The majority seeing it differently, I respectfully dissent.